IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AUG 2, 2016

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:16mj 355 |
| ) | |
| NICHOLAS YOUNG ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David Martinez, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Joint Terrorism Task Force ("JTTF"). I have been an FBI Special Agent since 2010. As part of my duties, I investigate terrorist activities. I have participated in numerous counterterrorism investigations, during the course of which I have conducted physical surveillance, executed court authorized search warrants and arrest warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2. This affidavit is submitted in support of a criminal complaint charging Nicholas Young with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement and government officials related to this investigation. The statements contained in this affidavit are based on my own observations, review of documents, recordings, and reliable information provided to me by other law enforcement officials.

4. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant. As a result, it does not include each and every fact observed by me or known to the government. This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to the consent of at least one party to the communication. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that an event occurred or a communication was made on a certain date, I mean that the event occurred or the communication was made "on or about" that date.

I. The Relevant Statute and ISIL

5. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq," this name has frequently been used to describe it through its history. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

2

6. Pursuant to Title 18, United States Code, Section 2339B, it is unlawful for any person to attempt to provide material support or resources to an FTO.

7. Based on my training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, are traveling to Syria and Iraq to join ISIL and commonly enter Syria by crossing the border from Turkey; (b) foreign fighters from Western countries are traveling to locations in Turkey, including Istanbul, and then traveling to towns closer to the border where they enter into Syria to join ISIL; (c) Abu Baker al-Baghdadi is the current leader of ISIL; and (d) ISIL is also frequently referred to as ISIS (an acronym for the Islamic State of Iraq and al-Sham or the Islamic State of Iraq and Syria).

II. <u>Young, Chesser, Khalifi, and Libya</u>

8. Nicholas Young is a United States citizen who resides in Fairfax, Virginia, and is employed as a police officer by the Washington Metropolitan Transportation Authority, where he has been so employed since 2003.

9. On September 12, 2010, FBI agents interviewed Young in connection with the arrest of Young's acquaintance, Zachary Chesser. Chesser had been arrested earlier in 2010 for attempting to provide material support to al-Shabaab, another designated FTO. During the interview, Young said that he was shocked by the charges. Young said that it would be Young's religious and personal duty to tell someone if Young became aware of terrorist activity.

10. On January 24, 2011, an undercover law enforcement officer ("UCO") reported on a conversation that UCO had with Young (while UCO was acting in an undercover capacity). Young said that he was wary of surveillance, and frequently took the battery out of his cell phone when he wants to go somewhere to talk. UCO reported that Young told UCO about an occasion

3

when Young aimed an AK-47 style rifle out of the window of his residence while Young was scanning for what he believed was law enforcement surveillance against him.

11. On February 28, 2011, UCO reported on another conversation with Young. UCO reported that Young stated that if he (Young) ever was betrayed by someone, that person's life expectancy would be greatly diminished. That same evening, Young told UCO that, if Young ever was betrayed, that person's head would be in a cinder block at the bottom of Lake Braddock. In a discussion about FBI surveillance, Young said "we" should pour gasoline on their cars and light them.

12. On March 10, 2011, UCO reported on another conversation with Young. UCO reported that Young said that Young used to torture animals when he was a child. UCO reported that Young said that Young despised the FBI, and that someone with Young's skills could attack an FBI establishment. UCO reported that Young said that firearms are not allowed to be brought into the federal courthouse in Alexandria, but described a method that Young could bring multiple guns into the courthouse undetected in order to distribute them to others inside.

13. UCO reported that, on March 21, 2011, he met with Young, Amine El Khalifi, and another individual, and spoke about the fundamentals of marksmanship.

14. UCO reported that, also on March 21, 2011, he shared a restaurant meal with Young and Amine El Khalifi. UCO reported that Khalifi said that Khalifi's Facebook page had been taken down because Khalifi posted mujahidin information on it. UCO reported that UCO and Young told Khalifi to be careful about his on-line posts, and that Chesser recently had been arrested for his posts on-line.

15. UCO reported that, also on March 21, 2011, Young said that he was angry with the FBI for contacting Young's family members and co-workers before speaking to him. UCO

4

reported that Young spoke about finding out where the FBI Special Agent who questioned him lived, and then kidnapping and torturing her. UCO reported that UCO doubted that Young seriously intended to act upon those words.

16. That same day, UCO reported that Young said that he was paranoid about cell phones, and he felt that the FBI was investigating him. Young said that he had several "burner phones," which I understand to refer to phones that can be used temporarily and then discarded and that are difficult to trace back to any particular user.

17. UCO reported that, on April 1, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that Khalifi said that this life is just a test, and that Khalifi was not concerned with any worldly possessions. UCO reported that Khalifi spoke of how shaheeds (meaning martyrs; in this context, those who die while conducting violent jihad) are sent to the highest level of heaven. UCO reported that Khalifi said that Khalifi had a mission from Allah, but did not state what it was. Young said that one of the greatest shaheeds is a convert who eventually fights the kaffirs for the Muslims.

18. UCO reported, also on April 1, 2011, that Young said that he had recently received a moving violation for an illegal u-turn in Falls Church, but that Young did not tell the officer that Young was himself a police officer because Young feared that the traffic cop would check with Young's department and find out that Young had already called in and said that he was on duty when he was not. My FBI colleagues obtained a copy of the traffic citation that actually was issued to Young, and also the records of the Washington Metropolitan Transit Police Department that indicate that Young was scheduled to be on duty at the time that traffic ticket was issued.

19. UCO reported that, on April 4, 2011, UCO and Young again shared a restaurant meal with Khalifi. UCO reported that UCO told Young of UCO's concern for Khalifi that Khalifi

5

was posting mujahidin propaganda on Facebook. UCO reported that, in response, Young said that Young would never talk about the things that Young was going to do, and that people would find out what he was going to do after it happened. Young said that if law enforcement searched Young's home, they would have issues because Young was stockpiling weapons. Apparently indicating what actions he would take against law enforcement personnel who attempted to search his house, Young told UCO that is what amphetamines, ballistic vests and assault rifles were for.

20. According to an interview with the FBI on September 10, 2011, Young said that he had traveled to Libya twice in 2011 and had been with rebels attempting to overthrow the Qaddafi regime. Baggage searches conducted by Customs and Border Protection on his outbound travel revealed that Young traveled with body armor, a kevlar helmet, and several other military-style items. Young was searched upon his return after the May trip, and was found to have brought the body armor back with him. Young said that on his second trip, he was initially turned away at the Libyan border by Egyptian authorities, but that he then took a one-way flight to Tunisia, and made his way into Libya from there.

21. UCO reported that, on January 26, 2012, Young said that he was paranoid that the U.S. government was spying on Young through Young's electronic devices.

22. In February 2012, Khalifi was arrested and charged with attempting to use a weapon of mass destruction (an improvised explosive device) in connection with his attempt to detonate himself in the U.S. Capitol Building in Washington, D.C. That same day, the other individual with whom Khalifi and UCO discussed the fundamentals of marksmanship on March 21, 2011, was arrested for possession of a firearm by a convicted felon.

23. In a conversation recorded by UCO on February 26, 2012, Young said that Muslims should actively try to uncover the informants who led to Khalifi's arrest.

II. Young and CHS

24. In 2014, Young met on about 20 separate occasions an FBI Confidential Human Source ("CHS"). CHS posed as a U.S. military reservist of Middle Eastern descent, who was becoming more religious and eager to leave the U.S. military as a result of having had to fight against Muslims during his deployment to Iraq.

25. As part of a conversation recorded by CHS on August 10, 2014, CHS told Young that CHS wanted to join ISIS. CHS stated that, based on what ISIS was doing right now, it was "becoming an obligation for us to go." When CHS asked, "how long can we stay and wait?" Young answered, "Exactly." Young advised CHS to watch out for informants, and not to discuss his plans with others. To minimize any suspicions on the part of law enforcement or Customs officials in the United States and Turkey that CHS was traveling to join ISIL, Young further advised CHS to sign up with a tour group through a travel agency, and not carry with him more than $10,000.

26. As part of a conversation recorded by CHS on September 11, 2014, Young again warned CHS against trusting people with knowledge of CHS's plans to travel to join ISIL. Young told the CHS that undercover personnel will make contact with a person of interest to law enforcement, assess them, and introduce them to other law enforcement personnel who investigate and ultimately make an arrest. Young described to CHS a specific type of recording device used by law enforcement to record conversations. Young also showed CHS a pro-ISIL video on YouTube.

27. As part of that same conversation recorded by CHS on September 11, 2014, CHS asked Young for Young's opinion on CHS's plan to join ISIL. Young told CHS that CHS was good to go, but that CHS should avoid putting any information on-line or communicating by email, because emails leave a trail for law enforcement to follow. Young advised CHS to reserve a hotel and keep a copy of the reservation to show authorities who might become suspicious of CHS's overseas travel.

28. As part of a conversation recorded by CHS on October 2, 2014, Young suggested that CHS contact representatives of ISIL through social media. Young recommended that CHS use a "burner" phone from wireless hotspots. Young suggested that CHS pack sturdy boots, socks, and cold weather gear for his trip to join ISIL. Young also recommended bringing sandals so CHS's feet weren't in boots all the time. Young warned that binoculars might raise suspicion, but getting a quality zoom camera could serve the same purpose. Young said that CHS could spend from a week to two months trying to get across the border from Turkey into Syria.

29. As part of a conversation recorded by CHS on October 9, 2014, Young reminded CHS that CHS did not need to join ISIL now. Young said that "either way you're not at the end of a plank, you have breathing room. It's a lot of responsibility in either case. There is no one with a gun to your head that is counting down."

30. As part of a conversation recorded by CHS on October 10, 2014, Young told CHS to trust no one, and reminded him about Chesser being sentenced for making postings on-line. On that same date, Young warned CHS to plan on getting stopped by authorities during his travels; Young advised CHS to remain calm and to stick to his story that he was traveling as part of a tour group, because the authorities would not know any different even if they acted as if they did.

31. As part of a conversation recorded by CHS on October 17, 2014, Young repeated his advice to CHS that he should plan on being stopped and questioned by authorities, but that CHS simply should stick to his story that he was with a tour group for his vacation. As part of a conversation recorded by CHS on October 23, 2014, Young role-played with CHS what to say to the border authorities in Turkey, and advised CHS that, if he got questioned, he should ask questions about whether it was safe in Turkey, and say, "I am joining a tour and I make friends easily."

32. As part of that same conversation on October 23, 2014, Young told CHS that when law enforcement discovers that CHS may have traveled to Syria, law enforcement authorities will look through CHS's phone records to see who CHS was in contact with. Young said that, in a couple of weeks, he would send CHS a text asking whether CHS was back from CHS's vacation yet; Young told CHS not to respond to that text because the text would be designed to be found by the investigators looking into who CHS was in contact with before CHS's overseas trip.

33. As part of a conversation recorded by CHS on October 24, 2014, Young and CHS discussed what was planned to be CHS's imminent departure from the United States. Young reiterated his warning that CHS should avoid creating a trail on Facebook or Twitter that would enable the authorities to prove that he attempted to join ISIL. Young repeated that CHS was likely to be stopped and questioned by authorities during his travels, but that CHS also would be allowed to proceed so long as CHS stuck to CHS's story. As part of a conversation recorded by CHS on October 25, 2014, Young repeated the warning that CHS would not get in trouble unless CHS talked about or admitted his plans to join ISIL.

34. As part of that same conversation on October 25, 2014, Young and CHS traveled to a FedEx Office store and set up email accounts for use in communicating only with each other once CHS made it to ISIL. Young set up an email account with the address that I will refer to as Essakobayashi@xxxx.com, and CHS set up an email account with the address that I will refer to as V4Vendetta@xxxx.com.

35. CHS then led Young to believe that CHS left the United States for ISIL, and later actually joined ISIL. In reality, once CHS led Young to believe that CHS had reached ISIL, CHS had no further contact with Young. All further communications between Young and CHS's email account were actually communications between Young and FBI personnel posing as CHS. In the remainder of this affidavit, I will refer to the FBI personnel posing as CHS as "UCO2" (for Under Cover Officer 2).

36. Consistent with the ruse that Young discussed with the CHS on October 23, 2014, Young sent a text message to CHS's cell phone on November 20, 2014, stating "Salam. Hope you had a good vacation. If you want to grab lunch after jumma hit me up." On this same date, UCO2 sent a message from the V4Vendetta@xxxx.com address to Young at the Essakobayashi@xxxx.com address, indicating that CHS had reached ISIL, saying, "Essa, Salaam Alaykum. I made it to dawlah! Mashallah words cannot explain...."

37. On December 17, 2014, video surveillance captured Young using a computer at a FedEx store in Fairfax, Virginia. At that same time, UCO2 received through the V4Vendetta@xxxx.com address a message from Young at the Essakobayashi@xxxx.com address, congratulating CHS for making it to ISIL. Young sent another email from the Essakobayashi@xxxx.com address to the V4Vendetta@xxxx.com account on December 24, 2014, describing for CHS how Young told some of CHS's friends that CHS had made it to ISIL.

10

38. On January 9, 2015, UCO2 received through the V4Vendetta@xxxx.com account a message from Young's Essakobayashi@xxxx.com account, expressing Young's thanks that CHS was safe. In his message, Young proudly referenced the murders of the staff of the Charlie Hebdo magazine in France that had occurred just days earlier:

> Glad to hear things are going well and that you are safe. If you are unable to write or get injured perhaps you could give this email address to one of your commanders so someone on this side of the world knows your status . . . yeah, I can imagine they are monitoring communications as much as they can to try and cause harm to you all...well, if you are in a comfortable situation down the road and want to set something up to chat just let me know. Safety and security first though of course.:) May Allah make it easy on you....Not sure if you got the news there yet...A couple brothers...were named in an assault on a french newspaper...Hopefully now people understand there are some lines you don't cross.

39. Between February and July 2015, Young periodically used the Essakobayashi@xxxx.com account to exchange messages with the V4Vendetta@xxxx.com account that he believed was controlled by CHS. Young asked CHS to notify Young if CHS encountered any of the mujahideen that Young served with in Libya in the "Abo Salem Suhada Brig." Based on my training, experience, and knowledge of various terrorist organizations, I believe Young's reference to "Abo Salem Suhada Brig" was a reference to a militia group in Libya that has possible links to al-Qaeda and that is known as the Abu Salim Martyrs Brigade.

40. On June 15, 2015, from Young's Essakobayashi@xxxx.com account, Young emailed CHS at the V4Vendetta@xxxx.com account a request that CHS ask CHS's commanders for advice as to how Young could move Young's money out of the United States. Young explained that he needed the advice because "[u]nfortunately I have enough flags on my name that I can't even buy a plane ticket without little alerts ending up in someone's hands, so I imagine banking transactions are automatically monitored and will flag depending on what is

going on." Young emailed CHS again on June 26, 2015, repeating Young's request that CHS ask his commanders about "a more advanced way of sending money."

41. On March 21 and 22, 2015, Young participated during off-duty hours in a weapons training event provided by another Metro Transit Police Department officer. The officer observed Young bring a large amount of ammunition to the training, and operate Young's own firearms, including an Egyptian AK-47, a Kimber 1911 .45 caliber pistol, and an AK-47 AMD rifle. On June 11, 2015, the training officer stated that Young said that Young also owned a semi-automatic 5.45 variant AK-47 RPK, an 8mm Mauser rifle, and a World War II-era Russian Negant rifle. The officer reported that Young once told the officer that Young wanted to buy a crate of Negant rifles to hand out if things went bad.

42. On June 1, 2015, Young was interviewed at his residence by law enforcement regarding an allegation of domestic violence. In the course of the interview, Young described dressing up as "Jihadi John" for a 2014 Halloween party that he attended with a friend. Young said that, as part of his costume, Young stuffed an orange jumpsuit with paper to portray a headless hostage, and he carried that around with him throughout the party. Young also said he has dressed up as a Nazi before and collects Nazi memorabilia. Young showed a tattoo of a German eagle on his neck. Young agreed that he knew that ISIS is a terrorist organization.

43. On December 3, 2015, the FBI interviewed Young, ostensibly in connection with an investigation into the whereabouts of CHS. Young said that CHS had left the United States to go on a vacation tour in Turkey approximately one year ago. Young said that he last saw CHS in October 2014, and had had no contact with CHS since October 2014. Young stated that Young had hung out with CHS only about three to six times. Young said that CHS did not talk about anything specific related to Syria that stuck out in Young's mind. Young said that he knew of no

12

one in the United States or overseas who helped CHS cross the Turkish border into Syria. In response to a request for an email address at which CHS might be reached, Young said that the address was something like the name by which Young knew CHS (which was nothing like "V4Vendetta"), and named an internet service provider that was not the service provider for the V4Vendetta account through which Young believed that he had actually been in contact with CHS.

44. On December 5, 2015, the FBI again interviewed Young, at his residence in Fairfax, Virginia. Young again said that he believed that CHS had left the United States to go on a vacation tour in Turkey approximately one year earlier, and that Young was unaware of anyone that CHS could have spoken with for travel guidance or advice. Young said that he had expected to hear from CHS once CHS returned to the United States from his vacation, but that Young no longer had any contact information for CHS.

45. On January 14, 2016, UCO2 sent an email to Young through the Essakobayashi email address that Young had set up with CHS on October 25, 2014. Among other things, the message said that CHS's mother had been questioned about CHS's whereabouts. On February 17, 2016, Young responded to that message, sending an email from the Essakobayashi account to the V4Vendetta address. Young wrote that his reply had been delayed because he was being careful in his communications. Young wrote that Young, too, had been questioned about CHS by law enforcement in December 2015.

46. That same day, Young also responded to an earlier email that UCO2 had sent from the V4Vendetta account, dated November 15, 2015. In this reply, Young discussed, among other things, the Paris attacks that had occurred just days earlier (resulting in approximately 130

13

people killed and nearly 400 others injured), and how the attackers were misunderstood, and how this gave the West a taste of what Muslims face every day.

### III. Purchase of Gift Cards for Use by ISIL in Obtaining Mobile Messaging Software

47. On April 18, 2016, UCO2 (posing as CHS) sent an email message from the V4Vendetta account to Young's Essakobayashi account, stating that Young could communicate securely with CHS in the future by using a particular mobile messaging application to contact a specific account CHS set up through that application. For ease of reference, I will refer to the particular account that UCO2 specified as the account through which to contact CHS as "CHS's MM Account."

48. On July 14, 2016, UCO2 received a message through CHS's MM Account from an account set up through that same mobile messaging application. The message expressed a prayer that "the situation is better than the news portrays," and included the sender's statement that he should have access to the mobile messaging account daily. As noted below, this message was sent by Young.

49. On July 15, 2016, UCO2 received an email on the V4Vendetta account from Young's Essakobayashi account, ostensibly notifying CHS that "Salam alikom brother, I messaged you on the app…" Inasmuch as (a) the address for CHS's MM Account had been provided by the FBI to no one other than Young; and (b) the message received by UCO2 on July 14, 2016, was the only message that CHS's MM Account had received (other than messages sent from the account provider or test messages from within the FBI), I know that the email that Young sent on July 15, 2016, was designed to ensure that CHS knew that the message received by CHS's MM Account the previous day was sent by Young. For ease of reference, I will refer to the specific account used by Young on July 14, 2016, as "Young's First MM Account."

14

50. On July 18, 2016, UCO2 responded to Young through Young's First MM Account. UCO2 wrote that ISIL used mobile messaging accounts to talk to individuals in the West seeking to join ISIL, and purchased the mobile messaging accounts through the use of gift cards (provided by an internet service provider) purchased in the West. UCO2 wrote that ISIL needed help in obtaining more gift cards (that could be used to set up more mobile messaging accounts to communicate with more individuals in the West seeking to join ISIL) because the individuals in the United Kingdom who previously had purchased the cards for ISIL (and then sent the codes on the back of the cards to ISIL) no longer were doing so. UCO2 wrote that ISIL used each mobile messaging account only one time, and that ISIL had only a few codes remaining. UCO2 wrote that, with only a few codes left, ISIL would be unable to set up accounts for all of the individuals in the West who wanted to communicate with ISIL in order to join it. UCO2 wrote,

> If u can only send couple codes this okay we understand I would not be where im today without u and Allah. May Allah swt reward our brothers in west and reward you for ur efforts.

51. On July 21, 2016, UCO2 received through CHS's MM Account another message from Young's First MM Account. In the course of that message, Young wrote "Interesting about the cards. Why were the brothers in UK told to stop? Inshallah more codes will come your way. Many sting operations and setups in this area."

52. On July 28, 2016, UCO2 sent another message to Young's First MM Account, explaining that the individuals in the United Kingdom stopped getting codes so they could save for their travel to ISIL, and later they were brought to ISIL because their computer skills were needed there. UCO2 wrote that "we still trying to get more code cards from few contacts in west

15

but it difficult to trust anyone in the west anymore. Any codes u can get will helpful and allow us to help many make hijrah. Only need a few right now."

53. On July 28, 2016, CHS's MM Account received a message from a mobile messaging account that was *not* Young's First MM Account. The message included 22 sixteen-digit codes. The codes were accompanied by the message, "Respond to verify receipt . . . may not answer depending on when as this device will be destroyed after all are sent to prevent the data being possibly seen on this end in the case of something unfortunate." The codes were from gift cards through the internet service provider referenced earlier by UCO2 on July 18, 2016, and redeemed by the FBI for $245. For ease of reference, I will refer to the specific account used by Young on July 28, 2016, as "Young's Second MM Account."

54. On July 29, 2016, UCO2 sent a message to Young's First MM Account, stating "MashaAllah may Allah reward you for efforts. This will help the brothers from Sudan seeking to fight in path of Allh in khilafah."

55. On July 30, 2016, UCO2 received through CHS's MM Account a message from Young's Second MM Account, stating "Glad it came through. Getting rid of device now...fo real. Gonna eat the Sim card. Have a good day." UCO2 also received through CHS's MM Account a message from Young's First MM Account, stating "Allah bless you. Stay safe. Waalikom Salam."

## Conclusion

56. Based on the foregoing, there is probable cause to believe that, between in or about October 2014, and on or about July 28, 2016, in Fairfax County in the Eastern District of Virginia, Nicholas Young knowingly attempted to provide material support and resources to a

16

designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B.

Wherefore, I request the issuance of an arrest warrant pursuant to the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

David Martinez
Special Agent, FBI

Subscribed to and sworn before me on this 2nd day of August 2016.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE